## The Associated Hat Manufacturers *vs.* The Baird-Unteidt Company.

Third Judicial District, Bridgeport, April Term, 1914.
PRENTICE, C. J., THAYER, RORABACK, WHEELER and TUTTLE, Js.

Employers, as well as employees, may form associations for the protection and advancement of their mutual interests, and when so associated may pass by-laws and regulations for the conduct of the business common to the members of the association, including a shut-down of their respective plants, if the object sought thereby and the means of its accomplishment are lawful; and such by-laws may also provide for an enforced payment to the association, from each member of it, for disobedience of its lawful decisions and orders.

The plaintiff was a non-stock incorporated association, composed of fifty-eight corporations, firms, and individuals engaged in the manufacture of felt hats, including the defendant whose factory was located at Bethel in this State. It was created to improve the business conditions of its members, to reform abuses incident thereto, to secure freedom from unjust and unlawful exactions, and to promote certainty and uniformity in the relations existing between its members and their respective employees. Its by-laws required all decisions, orders and regulations made by the association to be complied with in good faith by every member; and to insure such obedience "all members hereby agree to pay to the Association $5,000, as liquidated damages," for their violation of any lawful decision, order or regulation of the association, and that in any action to recover said sum "it shall not be necessary or incumbent upon this Association to prove any special damages whatsoever." Another by-law provided that no member could

Associated Hat Manufacturers *v.* Baird-Unteidt Co.

resign until after ninety days' notice in writing of such intention had been given to the secretary, and that no resignation should be accepted "during a suspension of work ordered by the Association." After unavailing attempts to adjust differences with the United Hatters, an unincorporated labor-union organization with a large membership, the plaintiff association, on January 14th, 1909, voted unanimously to discontinue the use of the union label, owned by the United Hatters, in every factory of every member of the association, and on January 28th, two weeks later, voted to operate such factories thereafter as "open shops," offering situations to operatives as individuals only. The hatting industry in the vicinity of Danbury and Bethel was dominated by the United Hatters, and, with two exceptions, none but "union" men were allowed to work in the factories of that locality. The defendant was thus unable to obtain help, and its factory remained idle until about the 9th of June, when it, and the United Hatters, assented in writing to certain "propositions" submitted by one of the residents of Danbury, a self-appointed mediator. These propositions called, among other things, for the resignation of the defendant from the plaintiff association, and an arbitration of all the defendant's differences with the United Hatters as soon as such resignation became effective; and until that time but no longer the United Hatters were to allow their union men to enter the employ of the defendant "as individuals." Upon the execution of this understanding the strike was declared off, and the union men went to work ostensibly "as individuals" but retained their membership in the union and paid to it the regular union dues based upon the wages earned. In an action to recover the stipulated sum of $5,000, it was *held:*—

1. That the vote of the plaintiff association to "offer situations to operatives as individuals" was not an order for a lockout and suspension of work, as contended by the defendant, but merely a declaration for an "open shop," its purpose or object being to preserve to all employers belonging to the association the inalienable right to contract for workmen regardless of whether they were or were not members of a labor union.

2. That the record furnished no basis for the defendant's further claim that the use of the union label of the United Hatters was the object of the plaintiff association; and that so far as appeared the label had nothing whatever to do with the resolution for an open shop.

3. That such a resolution was not a restraint of trade within the provisions of the Federal Act commonly known as the Sherman Law.

4. That the expressed intent of the plaintiff association and of its members to treat the $5,000, payable for disobedience of the association's orders, as liquidated damages, although not controlling, was entitled to weight; and that in view of the difficulty of estimating or measuring the loss entailed by a breach of the resolution to maintain open shops, and the absence of anything in the record to

indicate that the sum specified as liquidated damages was greatly disproportionate to the presumable loss, the expressed intent of the parties would be carried out and the damages regarded as liquidated.

5. That the written resignation of the defendant from the plaintiff association became effective upon its receipt by the plaintiff on September 9th, without any acceptance upon its part, such acceptance not having been made a prerequisite of a valid resignation either by the rules of the association or the law of the land; and that the provision in the by-laws, to the effect that no resignation should be accepted during a suspension of work ordered by the association, was inapplicable, since no suspension of work had been ordered, nor was any general shut down of the factories of its members contemplated by the order for open shops.

6. That the agreement made by the defendant with the United Hatters was in fact one for the employment of union labor exclusively, and was a clear and palpable violation of the "open shop" vote of the plaintiff association, which the defendant was bound in good faith to observe so long as it continued a member thereof, and therefore the defendant was liable to the plaintiff in the sum of $5,000, with interest thereon from the date of such violation.

7. That the present action was not one for the recovery of a "fine or assessment," which, under the by-laws, required authorization by a three-fourths vote of all the members of the plaintiff association, but was a mere incident of the plaintiff's ordinary business affairs over which its directors had full and complete authority.

Argued April 21st—decided July 13th, 1914.

ACTION to recover $5,000 as liquidated damages for the alleged violation of certain resolutions and orders of the plaintiff association—of which the defendant was a member—relative to the employment of labor in the hat factories connected with such association, brought to and reserved by the Superior Court in Fairfield County, *Curtis, J.*, upon a finding of facts, for the advice of this court. *Judgment advised for plaintiff.*

The plaintiff is a non-stock corporation of the State of New York, comprising fifty-eight companies, corporations and individuals engaged in the manufacture of fur-felt hats, with places of business in Connecticut, New York, New Jersey, Massachusetts, and Pennsylvania.

The defendant is a corporation located at Bethel, Connecticut, and was a member of the plaintiff association.

The plaintiff was the successor of the Wholesale Fur Felt Hat Manufacturers' Association, whose assets, property, rights, agreements, and contracts had been transferred to the plaintiff.

The purposes and objects of the plaintiff association, as recited in its certificate of incorporation, were to improve business conditions of its members, to maintain harmonious relations between them, and to promote, subserve and encourage social intercourse between them.

The preamble to its by-laws recites that "the objects of this Association, in addition to those set forth in its certificate of incorporation, are to foster the interests of those engaged in the manufacture and sale of fur-felt hats, to reform abuses relating to the business of persons so engaged, to secure freedom from unjust and unlawful exactions, to obtain and diffuse accurate and reliable information as to all matters affecting members of this Association, to procure uniformity and certainty in the relations existing between employees and employers, and in all lawful ways to promote and protect the business interests of this Association."

Its by-laws provide:—

"Article VIII. Section 1. The decisions, prohibitions, orders and regulations of this Association and its Board of Directors, shall be obligatory upon, and shall be complied with and observed in good faith by, each and every member of this Association.

"Section 2. In order to insure the compliance with and obedience in good faith to the decisions, orders, prohibitions and regulations of this Association, all members hereby agree to pay to the Association the sum of Five Thousand Dollars ($5,000), as liquidated damages, for the violation of or failure to comply with any of

the decisions, orders, prohibitions and regulations passed or made by the Association, in accordance with these by-laws and its certificate of incorporation. The said sum of Five Thousand Dollars ($5,000), is not a penalty, but is to be construed as the damages which this Association and the members thereof have suffered, by reason of the failure of any member to comply with the decisions, orders, prohibitions and regulations of this Association, and in any action which may be brought to recover the said sum, it shall not be necessary or incumbent upon this Association to prove any special damage whatsoever.

"Article IX, Section 1. Not less than one-third of all the members of this Association must be present in person, in order to constitute a quorum for business, provided, however, that any business before the meeting (a) involving the cessation or resumption of work by any or all of the members of this Association, (b) any regulations regarding the union label and (c) proceedings relative to any fine or assessment, no less than two-thirds of all the members of this Association must be present in person in order to constitute a quorum, and at least three-fourths of all members of this Association must concur in order to carry any motion or pass any regulation regarding these three questions.

"Article VII. Section 1. No member may resign from this Association until after ninety days' notice in writing to the Secretary shall have been given, and no resignation shall be accepted or become operative, until all dues, fines, assessments or other moneys due this Association shall have been paid, nor shall any resignation be accepted during a suspension of work ordered by the Association.

"Article VI. Section 10. The Board of Directors shall have power to settle all the controversies and difficulties arising between the members of this Association and

their employees, and to decide all disputes and disagreements that may arise, except that they shall not order a cessation or resumption of work, make any regulations regarding the union label, or proceedings relative to the forfeiture of any bond, contract, penalty or fine of any member of this Association."

The United Hatters of North America is an unincorporated association of journeymen hatters having over nine thousand members, and owning a union label which it permits to be placed in hats manufactured in factories employing its members solely and commonly called "union or closed shops."

From July 1st, 1907, to January 14th, 1909, the members of the plaintiff and its predecessor employed exclusively in their factories members of the United Hatters association.

The plaintiff's predecessor entered into an agreement, to which the plaintiff succeeded, with the United Hatters, that any disagreement between employer and employee should be submitted to arbitration. Prior to this agreement, in case of difference, the United Hatters withdrew the use of its label and compelled its members to discontinue work until the difference was settled, thus frequently coercing the employer to accept unfair conditions; and one of the purposes of the arbitration agreement was to avoid the stoppage of work and the removal of the union label pending the adjustment of differences. The United Hatters continued to act under this agreement until the difficulty with the Guyer Hat Company arose.

The Guyer Company was a member of the plaintiff and located in Boston, Massachusetts. The prices charged by the members of the United Hatters for piece work was less in Philadelphia than in Boston. On July 1st, 1908, the Guyer Company opened a factory in Philadelphia, and entered into an agreement

with the members of the United Hatters for a bill of
prices for piece work for hats manufactured in Philadel-
phia. In August, 1908, negotiations between the Guyer
Company and the United Hatters having failed, the
United Hatters refused to permit their members to
work in the Guyer factory unless the Guyer Company
paid the same scale of prices as in its Boston factory.
The Guyer Company referred the settlement of the
dispute to the plaintiff. The plaintiff insisted that
pending arbitration the union label should be restored
and the members put back to work. The plaintiff and
the United Hatters continued negotiations until about
January 1st, 1909, but the United Hatters refused to
restore the label or put the men back to work, and
insisted upon the Guyer Company performing its con-
tract with them upon the Boston scale of prices to its
members.

On January 12th, 1909, the board of directors of the
plaintiff passed a resolution that it recommend to the
Association "that the use of the union label be dis-
continued in every factory of every member of this
Association one hour subsequent to the passage of this
resolution, unless during the said period of one hour
the Association receives official notice that the label
will be restored to and the men immediately placed at
work in the factory of the Guyer Hat Company,
located in Philadelphia, Pa., under the conditions
existing at the time of the withdrawal of the label and
men."

On January 14th, 1909, the plaintiff association
passed unanimously, all members, including defendant,
being present, the resolution recommended, and recited
therein the arbitration agreement. On January 15th,
1909, the Association communicated to all of its mem-
bers the substance of this resolution, and the defendant
and the other members of the plaintiff informed their

employees that the union label would no longer be permitted to be used in their factories. Whereupon the employees who were members of the United Hatters, pursuant to its order, quit work, and all of the factories, including the defendant's, on January 16th, 1909, ceased to manufacture hats, which condition continued until January 29th, 1909.

The members of the plaintiff knew that a large proportion of the members desired to resume the operation of factories as open shops, and on January 28th, 1909, the board of directors of the plaintiff passed the following resolution: "That the board of directors recommend to the Association that each member offer situations to operatives as individuals, in their respective factories on February 9th, 1909." The treasurer of the defendant was present at this meeting. Immediately thereafter a meeting of the Association, duly called, passed a vote in accordance with this recommendation. The defendant was present at this meeting.

All of the members of the plaintiff, including the defendant, understood the resolution of January 28th, 1909, to mean the hiring of their employees as individuals in an open shop. The defendant and other members of the plaintiff in the Danbury district opened their factories for the purpose of receiving applications from all who desired employment as individuals, but none such were received owing to the control of the hatting industry in this locality by the United Hatters. Because of this condition and of its inability to secure employees, the defendant was unable to operate its factory until June 8th, 1909, and no hats were manufactured in the factories of the members of the plaintiff in the Danbury district during this period, while the members in other localities were able to operate their factories as open shops.

Shortly after January 28th, 1909, the defendant and

a majority of the members of the plaintiff in Danbury and Bethel became dissatisfied with the resolution of January 28th, and desired the same rescinded as unfair to them. Efforts were made by disinterested persons to settle the dispute between the hat manufacturers in the Danbury district who were members of the plaintiff, and the United Hatters, which resulted in the execution by these parties of the so-called Father Kennedy agreement, the substance of which is set forth in the opinion. Simultaneously with the execution of this agreement, the said members of the plaintiff agreed to indemnify and save harmless each other from any loss or liability, if any, which they or any of them may have or incur by making the aforesaid agreement, by reason of the obligations imposed on them as members of the plaintiff.

The members of plaintiff, parties to this agreement, carried it out by hiring directly the employees, members of the United Hatters, whereas under former conditions the shop steward, an employee of the United Hatters, employed them.

The defendant and other members of plaintiff, through Father Kennedy, about June 9th, 1909, forwarded to the plaintiff written notice of their intention to resign, and the plaintiff received these.

The United Hatters took from its members their union card, which a member of the union seeking employment must possess, and these cards were retained until September 20th, 1909.

The members of the United Hatters in the Danbury district voted, on June 8th, 1909, to accept the "Father Kennedy proposition," and to return to work in the manner set forth therein. On June 9th, 1909, the factories in the Danbury district resumed operations and so continued until September 20th, 1909. The workmen employed were former union workmen, and

most of them were compelled to pay their union dues, based upon their wages, but all were hired as individuals. Several members of the union who did not pay these dues were expelled from the union.

On September 8th, 1909, the defendant and the other members of the plaintiff in this district duly forwarded their resignations to the plaintiff, and these were on the next day received.

The defendant was not, on this date, indebted to plaintiff in any way for any sum, unless for the said $5,000. Except as heretofore recited, the defendant observed in good faith all the decisions, orders, prohibitions and regulations of the plaintiff.

On June 16th, 1909, the board of directors of plaintiff passed the following resolution: "Be it Resolved, that the president be authorized and directed to institute actions against the aforementioned members to enforce liability under Sec. 2, Art. VIII of the by-laws, and to enforce liability under the terms of the agreement made January the 14th, 1909, between the association and all of its members, and to employ attorneys and counsellors at law for the purpose thereof, and the action of the president thus far in the preparation for the institution of such actions and in all other respects is hereby ratified and confirmed." And pursuant to this resolution this action was begun. On September 15th, 1909, the Association passed a similar resolution, and ratified the said action of the board of directors in all respects. This suit was not authorized by a three-fourths vote of the members of the Association.

On September 20th, 1909, the defendant used the union label in its factory, and operated a union or closed factory, and the United Hatters exercised open authority over the journeymen hatters employed in defendant's factory.

The plaintiff offered no evidence of special damage,

but claimed that the damages for the breach of the resolution of January 28th were liquidated and fixed at $5,000.

*Milton Dammann* of New York City, and *Spotswood D. Bowers,* with whom was *John J. Walsh,* for the plaintiff.

*Martin J. Cunningham,* with whom was *Eugene C. Dempsey,* for the defendant.

WHEELER, J. The defendant claims this action must fail, since the plaintiff association is, because of its organization and its by-laws, illegal, and therefore its resolution, whose violation is the basis of the action, was invalid. The foundation of this claim is threefold, because (1) the real purpose and object of the Association was to permit it to order a suspension of work by its members; (2) to make agreements relative to the use of the union label; and (3), because the members of the plaintiff were engaged in inter-state commerce, the Association was a violation of the Sherman Act, as its purposes were in restraint of trade.

Employers as well as employees may form associations for mutual protection and benefit. Each member of such an association submits his freedom to contract, to a greater or less extent, to the will of the association. The consideration of submission is the benefit presumed to flow from the action of members bound together for common ends. Unity of action of the members gives strength to the association, without which it cannot serve its purposes or accomplish its ends. By-laws and regulations are a part of the machinery by which the association operates. Members must therefore submit, while membership continues, to all lawful by-laws and regulations enacted by the association for its government.

The objects of the plaintiff association, as stated in its articles of association and by-laws, are most worthy. Neither they nor the finding show that the purpose of the Association was to permit it to order a suspension of work, and to agree in reference to the use of the union label. It is too late to question the right of a labor union to make by-laws providing for strikes, and to issue its order for a strike in an effort to secure lawful objects by lawful means. *Reynolds* v. *Davis*, 198 Mass. 294, 84 N. E. 457. And it may prosecute the strike by any means neither illegal nor in violation of the equal or superior rights of others. So, too, the association of employers may enact a by-law giving it the right to order a shut-down of the factories of its members, provided the objects sought be within its lawful purposes and the means used be lawful. And the employer has the right freely to hire his labor in the market without denial or unfair restriction of this right. The order of the association to stop work may curtail this right, but it is not, for this reason, illegal.

A by-law providing for a fine upon the members of either an employers' or a laborers' association, for disobedience of its lawful orders, is not unlawful. Each may involve coercion of its members: it may temporarily take away the livelihood of the employee; and it may injure, and if continued ruin, the business of the employer. Each member has agreed to this species of coercion in the belief that the common interest of all will best be served by the united action of many. Obedience to the lawful orders of the association is the condition of membership voluntarily encountered by previous assent to the by-laws. If the defendant intended to claim that this part of the by-laws was illegal, we have already answered that a by-law of this character was not illegal.

The argument of the defendant rests upon the

premise that this resolution, "that each member offer situations to operatives as individuals," amounted to an order for a cessation of work. If the employees accepted employment as individuals, it is said they would forfeit their membership in the union; if they maintained their membership, the employers could not run their factories. As the Hatters' union dominated this industry in the Danbury district, enforcement of the vote would mean, it is said, a lockout and suspension of work. Therefore, it is argued, the vote was equivalent to a lockout.

The argument assumes these consequences. The facts of record show that consequences of this character were not intended. The vote is not to be read in the light of possible consequences. Its meaning is undoubted. A vote that each member offer situations to operatives as individuals is a declaration for the open shop. Its purpose was to preserve to employers the right to contract for their labor regardless of its membership in the union. The right to so contract is one of the inalienable rights of every employer of labor. Every employer and employee has under the law such freedom of contract. The law will not take it from him, much less declare illegal his effort to establish his right to it.

We see nothing in the record upon which to found the argument that the use of the union label was the object of the plaintiff. So far as appears the label had nothing whatever to do with the resolution in question.

We do not think it necessary to discuss the proposition that a vote by employers to conduct their factories as open shops, and to exercise their right to hire their labor as individuals and not as members of a labor union, is a restraint of trade within the Sherman Act.

Nor do we think the proposition tenable, that the object of the Association was the making of the arbitra-

tion agreement which the plaintiff had with the United Hatters, and that it was void because it involved the exclusive employment by the members of the plaintiff of union labor. The arbitration agreement does not bear this construction, and its making was a mere incident of the business of the plaintiff. Moreover, it did not relate to or enter into the vote for the open shop.

The recovery is sought for the violation of a resolution of the plaintiff, under § 2 of Article VIII of the by-laws, that "all members agree to pay to the Association the sum of Five Thousand Dollars ($5,000), as liquidated damages, for the violation of or failure to comply with any of the decisions, orders, prohibitions and regulations passed or made by the Association, in accordance with these by-laws."

The defendant urges that the action is instituted for the enforcement of a penalty.

The Association intended—if the language used means what it says—this sum to be regarded as liquidated damages upon a breach. Its intention, so definitely expressed, should be given due weight, but it is not controlling, for the law regards the substance of things rather than their form. It will "look at the entire agreement, its scope, purpose, and subject-matter, and may consider the result of a breach thereof, and the reasonableness of the sum agreed to be paid therefor, under all the circumstances of the case." *New Britain* v. *New Britain Tel. Co.*, 74 Conn. 326, 332, 50 Atl. 881, 1015. So viewing this by-law in its proper setting,—of the facts surrounding its making and its breach,—we see that there is no standard furnished for ascertaining the damages for the breach of a resolution of the plaintiff. We see, too, that the damages from a breach must be uncertain and incapable of exact estimate in advance of breach, and, after breach, are neither readily susceptible of proof nor of precise appraisal. It is obvious

the breach of the resolution might result in the breaking up of the Association, or in projecting it in a long and expensive fight with the United Hatters, a most powerful organization of union labor. The strength of the Association lay in the maintenance of a united membership; weakness, perhaps disintegration, might follow the secession of the members in the Danbury district. We cannot say, and we know of no one who could have said, exactly what loss the defendant's breach might or will entail. The record does not show that the amount specified as liquidated damages is greatly disproportionate to the presumable loss. The members of this Association knew their own situation and objects, and were in a far better position to appreciate and make provision for the breach of their own resolution under this by-law than a court can possibly be. Under these circumstances, the rule of law is that the expressed intention of the parties will be carried out and the damages regarded as the parties regarded them, as liquidated. *New Britain* v. *New Britain Tel. Co.*, 74 Conn. 326, 333, 50 Atl. 881, 1015; *Chase* v. *Allen*, 79 Mass. (13 Gray) 42; *Bilz* v. *Powell*, 50 Colo. 482, 117 Pac. 344; note to 38 L. R. A. (N. S.) 847.

The by-laws of the plaintiff required each member to comply in good faith with its decisions. Unless the defendant, while a member, failed to observe one or more of its decisions, it is not liable in this action. The defendant, on and after September 20th, ran its factory as a union shop, contrary to the terms of the resolution of January 28th, that the factories of the members should be run as open shops, and if at this time it was a member of plaintiff, all agree it thereby violated this resolution. The defendant claims it had resigned its membership on September 8th; the plaintiff claims the attempt to resign was nugatory. The defendant had at this time complied with all by-laws and regulations,

unless it had before this time violated the January 28th resolution. Acceptance of the resignation was not had nor was it necessary. A member of a non-stock corporation is in the same position as the member of an association, whose resignation becomes effective upon presentation and compliance with the rules of the association, unless acceptance is made a prerequisite to resignation by the rules or laws of the association, or the law of the land. A similar rule obtains in the case of the resignation of an officer of a corporation. 1 Bacon on Benefit Societies (3d Ed.) § 111; 4 Cyc. 302; 7 Thompson, Commentaries on Corporations, § 8729; *Will of McNaughton*, 138 Wis. 179, 208, 118 N. W. 997, 120 id. 288; 1 Morawetz on Private Corporations (2d Ed.) § 563. The by-laws (Article VII, § 1) provide that a resignation shall not be accepted during a suspension of work ordered by the Association. These resolutions mean that the members of the plaintiff should thereafter hire their employees as individuals in an open shop. They did not mean that the plaintiff had ordered a general shut down of the factories of its members. The finding shows this. All of its members outside the Danbury district were successful in operating their factories as open shops. The resolution of January 28th became effective on February 9th, in order to give the members time to prepare for a change and their former employees the opportunity to consider the advisability of returning to work as individuals. The defendant, with other Danbury members, advertised for employees as individuals, and on February 9th opened their factories for the purpose of receiving applications for employment as individuals. All this indicates that they were hopeful of resuming, not intent upon discontinuing, work. The resolutions as phrased do not mean a compulsory lockout; as read in the light of what preceded and followed their making, it is clear

that the members did not understand that their action would bring about a lockout, even in the Danbury district. The resignation of the defendant became effective upon its receipt by the plaintiff on September 9th.

The only other violation of which the plaintiff complains is the entering into the so-called Father Kennedy agreement, and the opening of the defendant's factory in pursuance thereof.

The open shop resolution of January 28th, if enforced, would deprive the United Hatters of the jurisdiction and control of all employees of the members, and would prohibit the employment of exclusively union labor. That it would precipitate a contest with a powerful labor organization was self-evident. United co-operation by each member in carrying out their attempt to secure to all the freedom to make their own contracts of hiring was an indispensable condition of success. The defection or disloyalty of the few would bring complete or partial disaster to the plan of the many. The utmost good faith in carrying out the plan was the duty of each member. The first resolution, that of January 14th, voting to discontinue the use of the union label, was voted for by the defendant. The finding does not show whether the resolution of January 28th was in fact voted for by the defendant or not. It matters not; it was duly adopted, and bound all members, the non-acquiescent as well as the acquiescent.

All of the factories of the Danbury district, except the two open shop factories, remained closed after the United Hatters withdrew their men on the day following the January 28th resolution. Many efforts were made to settle the strike. Finally two of the clergy, acting as self-appointed mediators, brought about an agreement, signed by all the members of the plaintiff in the Danbury district and by the officers of the United

Hatters. This was an agreement in which each of the contracting parties' agreed, in consideration of the promises of the other, to do certain things. It was an evident attempt to devise a plan under which work could be resumed pending the ninety days' notice of intent to resign of the members of the plaintiff, and, upon the resignations becoming effective, securing the return of these members to the closed shop, and to the complete resumption of the jurisdiction of the United Hatters over the employees of each member.

The plan was designed to avoid the liability which this action seeks to enforce. The very fact that these members entered into an agreement with the United Hatters concerning the opening of their shops and the conditions under which the members of the Hatters' association should resume work, was a breach by these members of the open shop resolution.

An analysis of the agreement deepens our conviction. The defendant and other members of the plaintiff, in consideration of the agreements of the United Hatters, and with the understanding that the agreement included a settlement of all present difficulties with the United Hatters and that future controversies should be settled by arbitration, the method of which should be determined as soon as they should sever the relations with the plaintiff, agreed to file the ninety days' notice of their intention to resign from the plaintiff, as required by the by-laws of the plaintiff, and to file with one of the mediators their resignations, to be delivered to plaintiff upon the expiration of the ninety-day period. And in consideration of these promises and of the agreement, the United Hatters agreed to declare the strike off as to these members of plaintiff and to permit their own members to return to work as individuals until these members of the plaintiff were relieved, by resignation or release, of their obligation to the plaintiff.

The parties mutually agreed that the prices for labor should remain as they had been until after the resignation and a new agreement had been made through arbitration; that new machines should have a fair trial at a named price to operators thereof, and that the union label should not be the subject of the future arbitration. Upon execution of the agreement the strike was declared off; the members of the union returned to work as individuals, but retained their membership in the union and paid to it the regular union dues, based upon the wages earned; and the union disciplined some of its members for the nonpayment of these dues.

Upon its face the agreement was an attempt to evade the liability which all the parties to it believed might arise in case these members violated the resolution of January 28th. The agreement was a cover, so manifest that it needs no argument to demonstrate it, for the purpose of having the factories of the members ostensibly run as open shops, but in reality run as closed shops under the jurisdiction of the United Hatters. When these members opened their factories to union labor exclusively, they were not complying in good faith with their obligation to open their shops to employees, nonunion as well as union employees. By this agreement the United Hatters dictated the scale of prices to be paid its members, who were outwardly hired as individuals by these employers. They limited the period when they were to work as individuals; they assumed control over their members who returned to work, by providing for an arbitration of all differences between the employers and their employees; they provided for an arbitration to determine the conditions of employment subsequent to the resignations and they expressly prohibited from such arbitration the subject of the union label. Had the intent been that their

members should return to work as individuals, holding the same relation to their employers as ordinarily exists between employer and employee, these conditions would not have been a part of the agreement. The purpose of the agreement was to make the shops as effectively union shops as they became after the resignations. The membership cards were taken up, and, after the resignations, returned, although at no time had these employees ceased to be members of the United Hatters.

The open shop resolution meant that the employers should be free to hire where they pleased and at such wage as the market for labor fixed, and that the employee should be free to choose his employer and to make his own conditions of employment. The agreement took from each the right to freedom of contract. These employers knew what they were engaged upon, for, simultaneously with this agreement, they agreed with each other to indemnify against any liability which might arise to the plaintiff. Had they, in good faith, intended to run an open shop, would they have felt it essential to make provision for the contingency of their agreement being held to be a violation of their obligation to the plaintiff? In fact, the agreement was to hire exclusively union labor. The contracting employers included all the manufacturers, with two exceptions, in the chief industry of the Danbury district. We held, in *Connors* v. *Connolly*, 86 Conn. 641, 86 Atl. 600, such an agreement against public policy and void.

Meritorious as the effort of these mediators to settle a strike of fatal consequence to large communities was, we cannot let our sympathy for the peacemakers cause us to forget that the security of society depends in great measure upon the preservation, inviolable, of the obligations of men. We think this agreement a plain violation of the resolution of January 28th.

Finally, the defendant claims the plaintiff had no authority to institute this action, since it was not authorized by a three-fourths vote of all the members of the plaintiff, as is required by Article IX, § 1, of the by-laws, in proceedings relative to any fine or assessment.

We have expressed the opinion that the recovery of the $5,000 under § 2 of Article VIII, is not an action brought to recover a fine or assessment but a sum determined as liquidated damages for a breach of any of the lawful decisions, orders, prohibitions and regulations of the plaintiff, and hence § 1 of Article IX has no relation to an action to prosecute the collection of this sum. Such an action is an incident of the business of the plaintiff, and committed, as are the ordinary business affairs of every corporation, to its directors, whose authority is complete except as curtailed by charter, by-laws, or the law. In this case, there was no such curtailment. The plaintiff ratified the action of the directors, but we think this did not add to the powers already vested in them by virtue of their office.

The Superior Court is advised to render its judgment in favor of the plaintiff for $5,000, with interest from June 14th, 1909.

Costs in this court will be taxed in favor of the plaintiff.

In this opinion the other judges concurred.