American Dental Company et al., Plaintiffs in Error,
v. Central Dental Laboratory Company et al., Defendants in Error.

Gen. No. 33,267.

Opinion filed March 5, 1930.

OTTO A. JABUREK and JAMES S. WIGHT, for plaintiffs in error.

Wm. A. Cunnea and Pines, Morse & Stein, for certain defendants in error; Alvin E. Stein and John M. Humphrey, of counsel.

Mr. Justice Ryner delivered the opinion of the court.

On April 19, 1927, certain corporations and individuals, 28 in number, filed their bill of complaint in the circuit court of Cook county, against five parties, named as defendants. The bill alleged that all of the parties to the proceeding had, for several years, been engaged in the business of owning and operating dental laboratories in the City of Chicago for the manufacture and sale of plates, bridges, crowns and other dental work and supplies, for the preparation of which each had and maintained special materials, facilities and equipment.

It is further alleged that the sole customers of the laboratories are dentists practicing in Chicago and neighboring communities; that the dental work furnished to the customers is prepared upon special directions, specifications, molds and measurements, to be used for the individual patrons of the dentists; that, by virtue of the nature of the work, regularity and promptness in the doing of it is essential, and that in the doing of the work persons of special skill and training are employed, who receive uniformly high wages and secure regular and permanent employment.

The bill then charges that the workmen employed in the laboratories had never belonged to any labor union; that no labor union pertaining to such workmen ever existed in Chicago until a short time prior to the filing of the bill, because the workmen had not felt the need of any such organization and had never had any serious disputes with their employees about wages and conditions of employment; but that "within the preceding year certain persons who were not employed in the

work of said dental laboratories and had never had any connection therewith, but who were engaged in the business of organizing and exploiting labor unions, attempted to organize the workmen of all dental laboratories in Chicago into a labor union, and having formed a union composed of a few of said workmen, attempted to compel all other workmen in said laboratories to join the same, using threats and intimidation, as well as persuasion to effect such object and were threatening to picket the laboratories whose workmen refused to join such union, and to attempt to establish a boycott upon the business of such laboratories."

The bill next sets out in *haec verba* a written agreement between the parties to the suit, dated February 28, 1927, which, after certain recitals to the effect that the parties are competitors, that they are familiar with the fact that labor unions have, at various times, made unjustifiable demands upon employers, and that they desire to enter into an agreement for their mutual protection, reads as follows:

"Now, therefore, the parties hereto, in consideration of the premises and of the recitals hereinabove set forth and of the mutual covenants hereinafter contained, agree together as follows:

"1. That in all controversies with labor unions and in all controversies with employees, which are of a general nature, and in all cases of controversies with a combination of labor unions and employers, the action taken by the party or parties hereto involved and affected by such controversy or controversies shall be such as may be determined by a two-thirds vote of all of the parties hereto; provided, however, that the action to be taken and the means and method employed shall be lawful.

"2. Such vote shall be taken at a regularly called meeting of the parties hereto. Such meeting shall be called by F. S. B. Cheesman or his successor, and the

notice of such meeting shall contain the time, place and object thereof.

"3. Since the damages for violation of this agreement are uncertain and incapable of exact ascertainment in advance of the breach thereof and even after breach and are not susceptible of definite and positive proof, it is agreed by all of the parties hereto that any party violating said agreement shall pay a sum equal to two hundred dollars for each technical employee of such party employed by such party at the time of the breach of said agreement as liquidated damages to the remaining parties hereto who have not violated this agreement; provided, however, that such sum so to be paid shall not be less than one thousand dollars nor more than ten thousand dollars; and provided further, that the number of employees upon which said liquidated damages shall be computed shall be the largest number of employees employed by said party so violating said agreement during the period of thirty days immediately preceding such breach.

"4. Since the liquidated damages herein specified may not constitute adequate damages for the breach of this agreement and the injury to the remaining parties to this agreement by reason of such breach being uncertain, irreparable and continuing, it is agreed that in addition thereto an injunction may issue, without notice, out of any court restraining any actual or threatened breach of this agreement.

"5. This agreement shall continue in full force and effect as to each and every party hereto until cancelled by any party hereto by a six months' notice in writing to all of the other parties hereto. Cancellation of this agreement by any party hereto shall cancel the same only as to such party and this agreement will remain in full force and effect as to all of the remaining parties hereto. A breach of this agreement by any party hereto will not release the remaining parties as

against each other, but if this agreement shall be breached by forty per cent or more of the parties hereto, any of the remaining parties hereto may cancel the agreement upon ten days' notice in writing to the other remaining parties hereto.

"6. It is further agreed that seventy-five per cent of the parties hereto may at any time by a vote duly taken, cancel this agreement and render the same null and void."

It is further alleged "that at a regularly called meeting of the parties to said contract held the 1st day of April, A. D. 1927, due notice thereof having been given, by a more than two-thirds majority vote, the following resolution was adopted, all of the parties to said contract having due notice thereof:

"RESOLVED, That in accordance with the provisions of the Employer Contract entered into by us on February 28, 1927, we will conduct and maintain our respective establishments on the nonunion basis and as nonunion, and

"BE IT FURTHER RESOLVED: That we as signers of the said contract will each day hereafter, and until such time as may be otherwise determined, accept from and perform work for such struck houses, and perform said work with reasonable dispatch, in order to assist such struck houses and permit them to maintain their service during the period of the existing strike."

It is then charged that the defendant Central Dental Laboratory Company violated the agreement and resolution by operating its laboratory upon a union basis and procuring its employees from the union; that George E. Dorsch, Master Dental Company and Standard Dental Laboratory, Inc., began operating upon a union basis, or announced their intention so to do, and that Leonard Galhouse, although complying with the terms of the contract, refused to join in the suit of the complainants.

The concluding allegations of the bill are: "that the aforesaid breaches of said contract by said defendants has greatly injured your orators in their dealings with their employees and in the conduct of their business, and if continued, will furnish a means whereby the said union, organized as aforesaid, may bring pressure upon the employees of your orators to compel them to join said union and stir up disputes between your orators and their employees, that said conduct of said defendants is a continuing injury to your orators in the conduct of their business by obstructing their efforts towards stabilizing their relations with their employees."

The prayer for relief is that the defendants be "enjoined and restrained for a period of six months from conducting and maintaining their respective establishments on a union basis until the parties to said contract shall by vote determine otherwise," and that a decree be entered against all of the defendants except Leonard Galhouse, for the damages sustained by the complainants.

Shortly after the bill was filed the Master Dental Company became a party complainant and its name was stricken from the record as a defendant.

The chancellor sustained the demurrers of the defendants to the bill, and, the complainants electing to abide by their pleading, the bill was dismissed for want of equity. The complainants have perfected this appeal.

The complainants rely upon two points in support of their contention that the decree of the trial court should be reversed. They say that "a contract by a group of employers to employ only those not members of a labor union is valid and enforceable" and that "a negative covenant in a contract may be enforced by injunction even though specific performance of the contract as a whole cannot be decreed."

The principal contentions of the defendants are that the contract and resolution are so uncertain in their terms as not to be enforceable; that they are in restraint of trade and, therefore, contrary to public policy; that they are not enforceable by injunction, and that this writ of error presents only a moot question.

The agreement is sufficiently definite in its terms to express the intention of the contracting parties that a two-thirds vote of the members should control the policy of all of the parties in dealing with labor organizations. The resolution expressed a policy of operating their establishments so as to exclude union employees. It does not appear from the allegations of the bill of complaint that the parties to the contract enjoy a monopoly in the operation of dental laboratories in the City of Chicago, or that either the contract or the resolution contravenes any principle of public policy.

In the case of *Hitchman Coal & Coke Co. v. Mitchell,* 245 U. S. 229, the Supreme Court of the United States said:

"That the plaintiff was acting within its lawful rights in employing its men only upon terms of continuing nonmembership in the United Mine Workers of America is not open to question. Plaintiff's repeated costly experiences of strikes and other interferences while attempting to 'run union' were a sufficient explanation of its resolve to run 'nonunion,' if any were needed. But neither explanation nor justification is needed. Whatever may be the advantages of 'collective bargaining,' it is not bargaining at all, in any just sense, unless it is voluntary on both sides. The same liberty which enables men to form unions, and through the union to enter into agreements with employers willing to agree, entitles other men to remain independent of the union and other employers to agree with them to employ no man who owes any

allegiance or obligation to the union. In the latter case, as in the former, the parties are entitled to be protected by the law in the enjoyment of the benefits of any lawful agreement they may make. This court repeatedly has held that the employer is as free to make nonmembership in a union a condition of employment, as the working man is free to join the union, and that this is a part of the constitutional rights of personal liberty and private property, not to be taken away even by legislation, unless through some proper exercise of the paramount police power. *Adair v. United States,* 208 U. S. 161, 174; *Coppage v. Kansas,* 236 U. S. 1, 14. In the present case, needless to say, there is no act of legislation to which defendants may resort for justification.''

In the case of *Coppage v. Kansas,* 236 U. S. 1, the same court said:_

''It is said in the opinion of the state court that membership in a labor organization does not necessarily affect a man's duty to his employer; that the employer has no right, by virtue of the relation, 'to dominate the life nor to interfere with the liberty of the employee in matters `that do not lessen or deteriorate the service'; and that 'the statute implies that labor unions are lawful and not inimical to the rights of employers.' The same view is presented in the brief of counsel for the state, where it is said that membership in a labor organization is the 'personal and private affair' of the employee. To this line of argument it is sufficient to say that it cannot be judically declared that membership in such an organization has no relation to a member's duty to his employer; and therefore, if freedom of contract is to be preserved, the employer must be left at liberty to decide for himself whether such membership by his employee is consistent with the satisfactory performance of the duties of the employment,'' and announced the further principle

that: "Every citizen is protected in his right to work where and for whom he will. He may select not only his employer but also his associates. He is at liberty to refuse to continue to serve one who has in his employ a person, or an association of persons, objectionable to him. In this respect the rights of the employer and employee are equal."

In the same case Mr. Justice Day, with whom Mr. Justice Hughes concurred, in a dissenting opinion said:

"I entirely agree that there should be the same rule for employers and employed, and the same liberty of action for each."

It requires the citation of no authorities to support the proposition that, if one employer may lawfully refuse to employ members of a union, a number of employers may enter into a valid agreement to pursue a concerted policy not to hire such employees, provided lawful means are adopted to effectuate the purpose. The principle applicable was aptly stated in *Gasaway v. Borderland Coal Corp.*, 278 Fed. 56, as follows:

"Unions of owners of capital may bargain collectively, through their officers, with laborers either individually or collectively. Unions of laborers may bargain collectively, through their officers, with employers either individually or collectively. Employers may bargain for a closed nonunion shop. Laborers may bargain for a closed union shop. Both are entitled to free and equal access to the pool of unemployed labor, for the purpose of securing recruits by peaceable appeals to reason. Employers may persuade a union man, provided they do not violate his right of privacy nor invade the rights of another, to become nonunion. Union laborers may under the same conditions persuade a nonunion man to become union."

There remains for our consideration the question whether the bill of complaint makes out a case for injunctive relief. It is evident, from its recitals and

terms, that the agreement in question, was entered into in anticipation of an attempt to organize the employees of the complainants into a union. But it contains no reference to any pending difficulties with employees or any organization of employees. The only showing made in the bill, tending to establish injury or threatened injury of such a nature as to warrant the issuance of the writ of injunction, is the charge that certain persons, not employed in the work done by dental laboratories, but engaged in organizing and exploiting labor unions, had succeeded in forming a union composed of a few workmen employed in dental laboratories, were attempting to compel other workmen to join the union and, in order to accomplish their purpose, were using threats and intimidation, and threatening to picket and boycott the places of business of the complainants whose workmen refused to join the union.

There is no charge in the bill that the defendants were conspiring with or in any way aiding the parties charged with attempting to form the union and to do the other acts complained of. They are charged with employing or threatening to employ union labor. It, therefore, is apparent that the sole purpose of the bill is to procure an injunction, restraining the defendants from breaching their contract.

In the case of *Associated Hat Manufacturers v. Baird-Unteidt Co.*, 88 Conn. 332, the Supreme Court of Connecticut had before it the by-laws of an association of hat manufacturers, which contained provisions almost identical with those embodied in the contract in the instant case. In particular, the by-laws provided for the payment, by any member of the association, of the sum of $5,000, not as a penalty but as damages for the failure to comply with the decisions, orders, prohibitions and regulations of the association. A member violated the terms of a resolution of the association with reference to the employment of union labor. The

court held, in a suit at law, that the provision for liquidated damages constituted a valid and enforceable agreement and directed the entry of a judgment for the amount specified in the by-laws. The case is not controlling as to whether injunctive relief may not also be granted, but does establish the principle that there is a remedy cognizable at law.

Counsel for the complainants concede that the provision for the issuance of the writ of injunction as an additional remedy for a breach of the contract, does not make it the duty of a court of chancery to grant the additional relief, unless it appears equitable so to do.

In the case of *Bartholomae & Roesing Brewing & Malting Co. v. Modzelewski,* 269 Ill. 539, the Supreme Court of this State had before it the question of enforcing a contract in which a saloonkeeper agreed, for a fixed period of time, to buy all of her draught beer from a certain brewery. This was prior to the eighteenth amendment to the Constitution of the United States. The contract provided for liquidated damages of $50 per month for a violation of its terms. One of the questions before the court was whether the brewery could enjoin the breaking of the contract by the saloonkeeper. The court held that there was an adequate remedy at law, saying:

"This brings us to the question, has appellant an adequate remedy at law? By the eighth paragraph of the contract it is specifically provided that if appellees shall at any time fail to keep and live up to the covenants and agreements of their contract, and shall make default in part of the contract and fail to purchase all of the draught beer of the party of the first part as therein provided for, then and in that event they shall pay to the party of the first part, as liquidated damages, the sum of $50 per month for each and every month and fraction of a month covering the unexpired

period of the contract from the date of such default to and including April 30, 1917. It will thus be seen that the parties themselves have by the express terms of their contract made provision for its breach and for the amount of damages that shall be paid in case of such breach, by way of liquidated damages, unless the same is held to be a penalty. That the object and purpose of the contract on the part of appellant were to secure to it the profits from the sale of its beer on the premises during the period of time covered by the contract is very clear from a consideration of the whole instrument. These profits, from their very nature, were of an uncertain character and difficult to estimate or ascertain with any degree of certainty. No one could estimate the amount of draught beer of the different kinds appellees would use per month, and each month, during the life of the contract. This must have been fully known to both the contracting parties, and they may well be presumed to have taken all of these matters into consideration in making the contract and fixing the amount of damages in case the contract was broken. Both parties were undoubtedly familiar with the business and deemed themselves better able to estimate and compute the amount of damages from that source than anyone else, and believed that by this provision in the contract they had done so. It does not appear to us that the amount so estimated and fixed by them is either unreasonable or disproportionate to the damages which might ensue from a breach of the contract. Under such circumstances the stipulated sum will not be held to be a penalty, where, from a consideration of the whole instrument, its object and purpose and the circumstances surrounding the parties at the time of its execution, it is clear the parties intended it as the measure of compensation in case of a breach of the contract.''

The court further said:

"If an injunction were to be issued, under the facts admitted in this case, to prevent a breach of this agreement, we fail to see how an injunction could be refused in any case to prevent the breach of all similar contracts where a business man agreed to sell in his place of business the products of a certain dealer and to refuse to sell any others. This would, in our judgment, be opposed to both reason and authority."

We are of the opinion that the principle announced in these cases is applicable to the instant case. The defendants were charged with no wrongful act except breaching their contract to abide by a decision of two-thirds of the parties to it as to the policy to be pursued in dealing with employees and labor organizations. The chancellor did not err in sustaining the demurrer to the bill.

The decree of the circuit court of Cook county is, accordingly, affirmed.

*Decree affirmed.*

WILSON, P. J., and HOLDOM, J., concur.